William R. Happel, Jr. v. Commissioner.
Happel v. Commissioner
Docket No. 27588.
United States Tax Court
1953 Tax Ct. Memo LEXIS 256; 12 T.C.M. (CCH) 514; T.C.M. (RIA) 53166; May 13, 1953
*256 Held, under all the facts, petitioner and his mother entered into a valid partnership for the taxable year 1944. Arthur McGregor, Esq., and Charles J. Higson, Esq., for the petitioner. Charles H. Chase, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion The respondent determined a deficiency in income tax for the year 1944 in the amount of $16,498.55. The only issue presented is whether petitioner is taxable upon income which was reported as partnership income distributable equally between petitioner and his mother during the taxable year. Findings of Fact Petitioner is an individual residing in Los Angeles, California. He filed his individual income tax return for the calendar year 1944 with the collector of internal revenue for the sixth district of California. In his return *257 petitioner reported the sum of $27,782.54 as allocable to him from the net income of Badger Sales Company, a copartnership. Clara P. Happel, petitioner's mother (who died prior to the trial of this proceeding), filed an individual income tax return for that year and reported therein the sum of $21,782.54 as allocable to her from the net income of said partnership. Such allocation was in accordance with the terms of a written partnership agreement executed by the parties on January 1, 1944, which provides that after a salary to the partner rendering additional services the profits should be divided equally. The partnership engaged in the business of operating, acquiring, selling, and renting coin-operated machines and amusement devices and was carried on in Los Angeles. In 1927 petitioner was out of work and without resources. His mother was in business at the time operating an art store in Milwaukee, Wisconsin. She also had a route selling Watkins Products, consisting of kitchen and household goods and appliances. At that time and since 1921 or 1922, petitioner's father was sick and unable to work. The mother supported her husband and herself. She suggested to petitioner that he *258 develop a route to sell butter and eggs, that she would furnish the capital and he his services, and that they would operate on a 50-50 basis. She purchased a truck for $500 and advanced $250 as working capital. The mother took care of the ordering, kept books, and supplied leads for the business. In 1928 the mother's attention was attracted to a new type gum-vending machine, and she and petitioner entered into the business of operating these machines in the taverns and restaurants where he sold butter and eggs. She purchased 10 of the machines at a total cost of $165. She also ordered the gum; filled replacement globes; counted, wrapped, and deposited the money; and kept the accounting records. The vending-machine business grew, and the proceeds were used to purchase additional vending machines. By 1929 petitioner and his mother were operating 150 machines. In 1930 it became apparent that they would be unable to continue both businesses because of the long hours required of petitioner. The mother suggested that if they purchased more vending and amusement machines they would make more than by continuing in the butter and egg business. Petitioner agreed, and the mother invested $1,500 *259 of her savings in additional coin-operated machines. In addition, the butter and egg route together with a truck was sold for $1,250, which was also put into the vending-machine business. Until 1931 the mother, in addition to contributing capital, kept all the books and records and did the banking. This business was called the Badger Novelty Company. In 1931 a store building was rented for the business, and thereafter the mother rendered services only in an advisory capacity, her active duties being taken over by hired employees. In 1932 she sold her art store for $2,500 and used the money to pay a portion of the purchase price of the building they were renting, which was acquired for $10,000. In that year the business also acquired distributorships for the sale of certain coin-operated machines. There was no written partnership agreement between petitioner and his mother at that time, but it was their mutual understanding that they were to share the profits 50-50. After the sale of the art store, the mother's sole source of income was from the Badger Novelty Company. Her original capital contributions came from money which she had saved from the operation of the art store. Subsequent *260 capital contributions by the mother were made from money which she received from the following sources: in 1939 she sold for $6,900 her home in Milwaukee which she had purchased in 1930 for $5,000; in 1938 she received $3,772 from the estate of her mother; and in 1937 on the death of her husband, she received proceeds from an insurance policy in the amount of $1,000, cash in the amount of $750, and $780 in settlement of an accident claim of the husband. The business in Milwaukee did not make large profits, the net income averaging $4,000 to $5,000 per year. In 1942 the building housing the Badger Novelty Company was sold for $10,000. With this money and with $11,000 cash from the capital account in Milwaukee and $9,000 in merchandise shipped from Milwaukee to Los Angeles, a similar business was started in Los Angeles under the name of Badger Sales Company. Subsequently, in 1944 a building was purchased for this business for approximately $16,000. The mother contributed $8,000 of which $3,000 came from Government bonds in which she had invested the proceeds of the estate of her mother and the balance she had saved and held in her safe deposit box. On January 1, 1944, petitioner *261 and his mother executed a written partnership agreement. This was the first written partnership agreement executed by them. Prior to 1944 petitioner had reported all of the income from the Badger Sales Company in his income tax returns. In his 1942 and 1943 returns, his mother was claimed as a dependent. In his 1944 return, petitioner reported all of the income from the Badger Novelty Company (the Milwaukee business). Although prior to 1944 no separate drawing account was set up for the mother, she received such amounts from the business as she needed. Petitioner would cash a check and give her the money in cash. In 1943 petitioner was divorced by his wife; and in discussing the property settlement made as an incident to the divorce with this accountant, it became apparent that a written partnership agreement defining the property rights of petitioner and his mother was desirable in order to protect the property of each of them with respect to claims that might be asserted against it. Acting on the accountant's suggestion, petitioner employed an attorney to draft the partnership agreement heretofore mentioned, which is as follows: PARTNERSHIP AGREEMENT "THIS AGREEMENT, entered *262 into in duplicate this 1st day of January, 1944, at Los Angeles, California, by and between WILLIAM R. HAPPEL, hereinafter referred to as First Party, and CLARA PAULINE HAPPEL, hereinafter referred to as Second Party, "WITNESSETH: "That the said parties hereto, having mutual confidence in each other, make this partnership agreement on the following terms and conditions, to-wit: "1. The partnership shall be for the carrying on of the business of sales, rentals, repairing, purchasing and otherwise dealing in coin-operated machines and amusement devices. "2. The partnership shall begin on the 1st day of January, 1944, and continue until dissolved. "3. Said partnership shall be conducted and carried on under the partnership name, style and firm of Badger Sales. "4. The place of business of said partnership shall be at 1612 West Pice, Los Angeles, California. "5. The partnership shall maintain a set of books at its place of business which shall reflect the capital investment of each of said parties in said business and the amount of said capital investment as shown by the books of said partnership shall be the determining factor in the distribution of the assets of the partnershup *263 [partnership] in the event of the death of one of the partners, dissolution of the partnership or the sale or assignment by one of the partners of his partnership interest. "6. Said partners shall be entitled to draw from the profits of said business for his own separate account a sum equal to fifty (50%) per cent of the net profits of said business as reflected by the books of the partnership provided, however, that the partners may agree to establish such surpluses as they deem expedient. It is understood and agreed that all drawings made by said partners shall be only from profits of said partnership, except by the consent of both partners and, unless such consent is obtained, any overdrawal shall be repaid to the partnership by said partner overdrawing his account. It is further agreed that in the event one of said partners devotes additional or more time to the partnership than the other, or in the event that one partner shall render services of exceptional value to the partnership, the partners may agree upon additional compensation for said partner rendering such additional or extraordinary services. "7. Each of the parties hereto shall diligently employ himself in the *264 business of the said partnership, and be faithful to the other in all transactions relating to the firm, and give, whenever required, a true account of all business transactions arising out of, or connected with, the conducting of the partnership, and neither of the parties shall engage in any business except that of the said partnership or upon account thereof, and neither shall, without the written consent of the other, employ either the capital or the credit of the partnership in any other than the partnership business. "8. Said First Party shall have the charge of the office, shall keep the books of the partnership, shall have exclusive charge of all the financial details of the partnership including the receiving and collecting of all moneys due the partnership and the payment of all moneys due from said partnership to others, whether in the general conduct of said business or otherwise. Second Party shall use her best ability in assisting First Party in the conducting of the partnership business and in promoting sales and good will for said partnership. "9. Books of account shall be kept by said partners, and entries made therein of all moneys, goods, effects, debts, sales, *265 purchases, receipts, payments, and all other transactions of the partnership. Said books of account, together with all bonds, notes, bills, letters, and other rights belonging to the said partnership shall be kept where the business of the partnership shall be carried on, and shall be at all times open to the examination of both partners. Said books shall be kept in the exclusive custody of said First Party, and all partnership moneys received from any and all sources shall be deposited by the said First Party in the name of the partnership in the Sec. 1st Nat'l Bank bank of Pico & Alvarado, Los AngelesCalif and shall be withdrawn therefrom only by check drawn and signed by said First Party. "10. Neither of the partners, during the continuance of this partnership, shall assume any liability for another or others, by means of endorsement or of becoming guarantor or surety, without first obtaining the consent of the other thereto in writing. "11. At the expiration of each and every month from the commencement of this partnership, or oftener upon request in writing by one partner to the other, an account of stock, effects, credits, debts, and all partnership transactions shall be *266 taken, and the true condition of the partnership, as far as possible, arrived at, and each partner agrees to lend his aid and services to effect this object. "12. In case of the termination of this partnership, from whatever cause, the parties hereto agree that they will make a true, just and final account of all things relating to said business, and in all things duly adjust the same. And after all the affairs of the partnership are adjusted, and its debts paid off and discharged, then all the stocks, as well as the gains and increase thereof, which shall appear to be remaining, either in moneys, goods, fixtures, debts, or otherwise, shall be divided between the parties hereto in proportion that their capital investment bears to the capital investment of both partners as reflected by the books of account of the partnership at the time of said disolution [dissolution]. "13. In the event of the death of one partner, the surviving partner shall have the right to transact all and any partnership business necessary in the winding up and dissolution of the partnership. The interest of either of the partners hereto cannot be sold, assigned or encumbered without the consent of the *267 other partner. "14. The parties hereto by this agreement do hereby convey to each other a joint tenancy interest in and to the whole of said partnership and upon the death of either of the parties hereto all of the partnership assets shall vest in the survivor. "IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first above written. "s/W. R. Happel Jr. FIRST PARTY "s/Clara Pauline Happel SECOND PARTY" The partnership operated the business pursuant to this written agreement until 1946. In that year the business was incorporated, petitioner receiving one-half of the issued shares and his mother the other one-half. The building was not transferred to the corporation but was rented by the partnership to the corporation. Petitioner's 1944 income tax return was examined by an agent of the respondent in March or April of 1947. In 1948 the building was transferred to the corporation for preferred shares which were issued one-half to petitioner and one-half to his mother. The mother died on December 8, 1951, at the age of 73. The stock standing in her name in the Badger Sales Company was a part of her estate and, under the will, was distributable one-half *268 to petitioner and one-half to his brother. Petitioner's and his mother's withdrawals from the business for the years 1944, 1945, and 1946, as shown on the books of the business, were as follows: 1944
1945
1946
Petitioner
$33,425.51
$20,857.43
$ 5,142.88
Mother
10,197.22
4,342.55
17,776.89 In years prior to 1944, the mother's drawings were charged to petitioner on the accounting records of the business, and no separate account was carried for her. The $10,197.22 shown on the books to be withdrawn by her in 1944 was for the payment of Federal income taxes on 50 per cent of the net profits of Badger Sales Company. The $4,342.55 shown to have been withdrawn by her on the books of the company for 1945 was for the payment of Federal income taxes on 50 per cent of the profits of the Badger Sales Company, taxes paid to the State of California, and 12 withdrawals of $50 each. The $17,776.89, shown on the books of the company to have been withdrawn by her in 1946, consisted of monthly drawings ranging from $50 to $600 a month and an item of $12,137.42 which was used to purchase a residence in San Gabriel, California. Petitioner lived in the residence for a *269 short time after which it was sold. Petitioner's mother did not live there. Petitioner's mother rendered substantial services in the formative years to the Badger Novelty Company but performed no services in the conduct of the business of Badger Sales Company other than in an advisory capacity. Petitioner always consulted with her on major business policies. Petitioner's mother also made substantial capital contributions to both businesses. During the taxable year, the parties intended to and did enter into a bona fide partnership. Opinion RICE, Judge: The respondent, in arguing that the petitioner and his mother did not in good faith and with a business purpose intend to join together in the present conduct of a partnership, points to some statements made by the mother to the revenue agent in 1947 which were somewhat inconsistent with petitioner's testimony as to the amount of the mother's capital contribution; points to the partnership agreement to show that petitioner retained control over the management and income of the business which did not "evince a bona fide intent to conduct the business as a true partnership"; argues that the mother performed no services in the taxable *270 year because she stated to the revenue agent that she occasionally straightened up the office in the evening; and contends that the evidence does not show that petitioner's mother contributed any capital to the Los Angeles business. While the record here leaves something to be desired, and while it is true that petitioner's testimony is somewhat in conflict with the statements made by his mother to the revenue agent in 1947, it must be remembered that the mother at that time was in her late sixties. The revenue agent in testifying about his conversation with the mother concerning the partnership stated: "A. She told me that her son had started in business back in Milwaukee in the late '20's or the early '30's and that she had assisted him, at various times she advanced him money. She recalled vaguely it was somewhere in the neighborhood of $3,000 over the period 1930 to 1937. She had not too definite recollections of that. "She said it was a family affair, she advanced the money with no thought of having it given back. It was more or less of a gift. She was anxious to see her son succeed, as all mothers are anxious to see their sons succeed in business. "Then later on she said *271 she couldn't - I questioned her about the $8,000.00 contribution that was entered on the books of the Badger Sales Co., and she stated she couldn't remember whether or not she gave $8,000.00 to Mr. Happel for the business. "Q. Did you ask her about any services which she might have performed in the business? "A. Yes, I asked Mrs. Happel what her services were for the Badger Sales Co., and she said that on occasions she would go back in the evening and straighten up the office, after the business day was over. "Q. Did she tell you any other services she performed? "A. No, that was all she told me about." We feel that the respondent has placed undue emphasis on the above-recited conversation. The mother was an elderly person at the time of the conversation, and in the words of respondent's agent "She had not too definite recollections" and "she couldn't remember". She died prior to the hearing and was, therefore, not available as a witness. Our findings show that the business was incorporated in 1946 and that its stock was issued to the petitioner and his mother on a 50-50 basis. When she died in 1951, her stock was a part of her estate and, under her will, was distributable *272 one-half to petitioner and one-half to his brother. While such facts are not determinative, they tend to corroborate petitioner's testimony to some extent, especially in view of the fact that the audit by respondent's agent did not take place until 1947. After a careful study of the entire record, including petitioner's testimony and that of the accountant who recommended the formation of the partnership, we are of the opinion that the mother made a substantial capital contribution to the business and, in the formative years, rendered substantial services. The partnership must, therefore, be held to be a valid partnership for income tax purposes. See , affd. , certiorari denied ; and cf. . Due to other uncontested adjustments by the respondent, Decision will be entered under Rule 50.